UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

FIDUCIARY NETWORK, LLC,                 :
                                        :
                          Plaintiff,    :
                                        :
            -against-                   :
                                        :
MARK P. HURLEY,                         :
                                        :
                          Defendant.    :

-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/3/2020

1:19-cv-379-GHW

<u>MEMORANDUM OPINION
AND ORDER</u>

GREGORY H. WOODS, United States District Judge:

Mark Hurley was the CEO and owner of about 20 percent of Fiduciary Network LLC.  EB

Safe, LLC ("EB") owned about 75 percent of Fiduciary Network.  In 2016, Hurley and EB began to

feud for control of Fiduciary Network.  Hurley exercised his contractual right to trigger a forced sale

of Fiduciary Network, planning to participate in the sale process as a bidder.  After two arbitrations

and multiple lawsuits, the parties went through a sale process to auction Fiduciary Network to the

highest bidder.  But after the bids were submitted, EB exercised its contractual right of first refusal

to match the highest bid and retain ownership and control of Fiduciary Network.  EB then fired

Hurley as CEO.

During the control struggle, Hurley was arrested on a charge of domestic violence.  Fiduciary

Network opened an internal investigation into Hurley's arrest.  Hurley now demands that Fiduciary

Network pay him almost $1.5 million in legal fees associated with the internal investigation.

Fiduciary Network sued Hurley seeking a declaratory judgment that it does not have to pay

those attorneys' fees and asserting claims against Hurley for tortious interference with economic

advantage under New York law.  Both parties now move for summary judgment.  Because Hurley is

not entitled to indemnification for his attorneys' fees, Fiduciary Network's motion is GRANTED as

to the declaratory judgment claim.  But there are disputed issues of material fact about Hurley's

conduct after he was terminated, so the motion is DENIED as to the tortious interference claims. Hurley's motion is also GRANTED in part because no reasonable factfinder could conclude from the record that the Texas lawsuit was frivolous. But Hurley's motion is DENIED as to Fiduciary Network's other theories supporting its tortious interference claims.

## I. BACKGROUND

### A. Facts[1]

Hurley founded Fiduciary Network with EB to provide long-term financing to wealth management firms in 2006. Hurley's Opposition to Fiduciary Network's Statement of Undisputed Material Facts ("Pls.' 56.1 Stmt"), Dkt No. 77, ¶ 1 (citing Final Award, Ex. 1 to Declaration of Neil Steiner ("Steiner Dec."), Dkt No. 66, ¶ 64; Complaint in Texas Litigation ("Texas Complaint"), Ex. 2 to Steiner Dec. ¶ 28).[2] Hurley was the CEO of Fiduciary Network. *Id.* ¶ 3 (citing Final Award ¶ 65). In that capacity, Hurley managed Fiduciary Network's day-to-day operations and appointed two members of Fiduciary Network's Board of Directors (the "Board"). *Id.* (citing Final Award ¶ 65). From 2006 to November 2018, Fiduciary Network transacted with fourteen wealth management firms (the "Portfolio Companies"). *Id.* ¶ 4 (citing Answer, Ex. 4 to Steiner Dec., ¶ 11).[3]

#### 1. The LLC Agreement

The rights and obligations of Fiduciary Network and its members are governed by the Third Amended and Restated Limited Liability Company Operating Agreement of Fiduciary Network, LLC ("LLC Agreement"). *Id.* ¶ 6 (citing Ex. 5 to Steiner Dec.). As set forth in the LLC Agreement, EB owned about 75 percent of Fiduciary Network, Hurley and two associated trusts owned about 19 percent, and the rest of the management team owned the remaining six percent. *Id.* ¶ 5 (citing Final Award ¶¶ 64, 66; Schedule 1 to LLC Agreement).

---

[1] Unless otherwise noted, these facts are undisputed.
[2] As discussed below, the "Final Award" is a final arbitration award in a related proceeding. The "Texas litigation" is a suit filed by Hurley in Texas.
[3] The "Answer" is Hurley's answer in this litigation.

Section 6.7 of the LLC Agreement ("Section 6.7") is an indemnification provision. *Id.* ¶ 63 (citing LLC Agreement § 6.7; Hurley Dep. at 24:25-25:8, Defendant's Objections and Answer to Plaintiff's Second Set of Interrogatories, Ex. 30 to Steiner Dec. at 3, No. 9). Section 6.7 provides that Fiduciary Network will indemnify its directors and employees in certain circumstances:

> With respect to any claims, suits, actions or similar proceedings brought by any third party, the Company shall indemnify and hold harmless each current and each former Manager, each current and each former Member, each current and each former officer and employee of the Company, and each former management committee member of the Company (each, an "Indemnitee") from any and all liability, loss, cost, expense (including reasonable attorneys' fees and disbursements), claim or damage (collectively, "Management Expenses") incurred or sustained by such Indemnitee by reason of (i) any act or omission in the conduct of the business of the Company in accordance with the provisions hereof, or (ii) such Indemnitee's service as a representative, officer, director, manager, principal, employee or agent of the Company, except in each case to the extent that such Management Expenses were incurred or sustained as a direct result of such Indemnitee's willful misconduct, gross negligence, bad faith or fraud.

*Id.* ¶ 64 (citing LLC Agreement § 6.7).

The LLC Agreement also gives EB and Hurley rights to buy or sell portions of Fiduciary Network. EB had a "Call Right" under the LLC Agreement to purchase Hurley and the management team's interests in the Company after December 1, 2017 at a price determined by a formula based on Fiduciary Network's earnings before interest, taxes, depreciation and amortization ("EBITDA") and the growth rate in EBITDA. *Id.* ¶ 8 (citing LLC Agreement §§ 7.4, 7.5). Hurley also had the right to trigger a force sale of Fiduciary Network (the "Forced Sale Right") through an auction process (the "Sale Process") on December 1, 2015 and on every December 1 thereafter. *Id.* ¶ 9 (citing LLC Agreement § 7.3). If Hurley triggered the Force Sale Right, EB had the option to acquire the outstanding equity of Fiduciary Network by exercising its Call Right or making an offer to purchase directly to Hurley before the beginning of the Sale Process. *Id.* ¶ 10 (citing LLC Agreement §§ 7.4, 7.6, Final Award ¶ 68). EB also had a Right of First Refusal ("ROFR") to match the highest third-party bid at the end of the Sale Process, as long as EB paid the highest third-party bidder a substantial break-up fee of about 10 percent of the deal value. *Id.*

### 2. The First Arbitration and Hurley's Arrest

Hurley delivered a notice of his intent to exercise his Forced Sale Right to EB in November 2016. *Id.* ¶ 11 (citing Final Award ¶ 69). In January 2017, EB began an arbitration against Hurley to determine if EB could exercise its Call Right to purchase Fiduciary Network. *Id.* ¶ 12 (citing Final Award ¶ 69, Texas Complaint ¶ 42). In August 2017, the arbitration panel held that EB could not exercise its Call Right because it had been waived. *Id.* ¶ 13 (citing Final Award ¶ 69). So the Sale Process began in August 2017. *Id.* ¶ 14 (citing Final Award ¶¶ 69-70).[4]

In September 2017, EB and Hurley each appointed two members to a four-person Negotiating Committee to supervise the Sale Process. *Id.* ¶ 15 (citing Final Award ¶ 71). The Negotiating Committee retained Evercore Group and Davis Polk & Wardwell LLP to advise it during the Sale Process. *Id.* ¶ 16-17 (citing Final Award, ¶ 71, 76).

Hurley was arrested on domestic violence charges after an altercation with his wife on November 21, 2017. *Id.* ¶ 18 (citing Final Award ¶ 74; Hurley Arrest Record, Ex. 6 to Steiner Dec.; Incident Report, Ex. 7 to Steiner Dec.). The next day, Hurley instructed Yvonne Kanner, a member of Fiduciary Network's management team, to reschedule meeting with potential bankers because of a "family emergency." *Id.* ¶ 19 (citing Final Award ¶ 74). A few days later, Hurley resigned from the board of directors of Santander Consumer (USA) Inc. *Id.* ¶ 20 (citing Final Award ¶ 172; Defendants Objections and Answer to Plaintiff's Requests to Admit ¶ 6). Hurley did not disclose his arrest to the Board, the Negotiating Committee, Evercore, or Davis Polk. *Id.* ¶ 21 (citing Final Award ¶ 172; Deposition of Mark Hurley ("Hurley Dep."), Ex. 10 to Steiner Dec. at 64:6-9). Hurley viewed his arrest as a "private matter" that did not affect his ability to perform as CEO of Fiduciary Network. *Id.* ¶ 22 (citing Hurley Dep. at 61:2-5, 64:6-9).

---

[4] This arbitration panel's decision was not the "Final Award." The Final Award was issued at the end of a different arbitration proceeding, discussed below.

### 3. The Second Arbitration and the Final Award

In December 2017, EB began a second arbitration against Hurley to determine whether he could participate in the Sale Process as a bidder. *Id.* ¶ 23 (citing Final Award ¶ 14). EB retained a private investigator who discovered Hurley's arrest. *Id.* ¶ 24 (citing Affidavit of Spencer Daum ("Daum Aff."), Ex. 11 to Steiner Dec.).

In March 2018, two members of Fiduciary Network's Board called for a special meeting to begin an internal investigation on the effect of Hurley's arrest on Fiduciary Network and its Portfolio Companies and to suspend Hurley during the investigation. *Id.* ¶ 25 (citing Notice of Special Meeting, Ex. 12 to Steiner Dec.). About a week later, Hurley sought leave to amend his counterclaims in arbitration to enjoin the Board from suspending him as CEO and conducting the internal investigation. *Id.* ¶ 26 (citing Final Award ¶ 41, Letter Regarding Respondent-Counterclaimant's Amended Pleading, Ex. 13 to Steiner Dec., Hurley Dep. at 49:4-17); *see also* Final Award at 1 (explaining that Hurley "submitted additional counterclaims relating to the permissibility under the LLC Agreement of certain resolutions adopted by the Board of Managers of Fiduciary Network . . . to commence an investigation into alleged conduct by him, and to suspend him with pay from his role as the CEO of Fiduciary Network pending the conclusion of that investigation").

After Hurley filed the amended counterclaims, EB and its appointees to the Board petitioned to stay the ongoing arbitration in New York state court. Pls.' 56.1 Stmt ¶ 27 (citing Final Award ¶ 49, Petition to Stay Arbitration, Ex. 14 to Steiner Dec.). The state court denied the petition. *Id.* ¶ 28 (citing Decision on Petition to Stay Arbitration, Ex. 15 to Steiner Dec.). The arbitration tribunal (the "Tribunal") then held a hearing on Hurley's amended counterclaims in April 2018. *Id.* ¶ 29 (citing Final Award ¶ 52).

About a week later, Hurley submitted a fee application as to the second arbitration. *Id.* ¶ 30 (citing Final Award ¶ 60; Fee Application, Ex. 16 to Steiner Dec.). That application sought almost $5 million in attorney's fees and costs incurred for the work of two law firms related to the

arbitration. *Id.* Those fees and expenses included more than $1 million for the services of Ropes & Gray ("Ropes") from March to April 2018 and almost $100,000 for Brewer Attorneys & Counselors ("Brewer") in April 2018. *Id.* ¶ 31 (citing Fee Application; Ropes & Gray Invoice #1, Ex. 20 to Steiner Dec.; Ropes & Gray Invoice #2, Ex. 21 to Steiner Dec.; Brewer Invoice, Ex. 26 to Steiner Dec.).

The Tribunal issued the Final Award in May 2018. *Id.* ¶ 32 (citing Final Award ¶¶ 134-37). The Tribunal permitted Hurley to participate as a bidder in the Sale Process, subject to oversight by the Negotiating Committee over any communications with potential bidders. *Id.* The Tribunal also dismissed Hurley's amended counterclaims and held that the Board could proceed with the internal investigation and suspension of Hurley. *Id.* ¶ 33 (citing Final Award ¶¶ 186-87, 196-97). The Tribunal awarded Hurley half of the fees and expenses for work performed by Ropes but denied his request for costs and fees incurred by Brewer. *Id.* ¶¶ 34-35 (citing Final Award ¶ 214-15). Brewer had represented Hurley in his divorce proceedings. *Id.* The Tribunal reasoned that Brewer's work on Hurley's divorce was too attenuated from the issues in the arbitration to be compensable. *Id.*

### 4. The Internal Investigation and Hurley's Indemnification Demand

The Board retained Hannah Berkowitz of Murphy & McGonigle, P.C. to conduct the internal investigation. *Id.* ¶ 40 (citing Defendant's Objections and Answers to Plaintiff's Requests to Admit ¶ 18). In June 2018, David Beran, General Counsel of Fiduciary Network, emailed Board members to request the Board's approval for Fiduciary Network "to provide employees (other than [members of Fiduciary Network management] Ben [Robins], Yvonne [Kanner] and Steve [Cortez] who I understand via Hannah retained Ropes & Gray in regards to this matter) with the opportunity to have joint counsel in connection with Hannah's employee interviews." *Id.* ¶ 41 (citing Beran Email, Ex. 17 to Steiner Dec.). Beran advised the Board that it was "important in the interest of expediency and efficiency that the employees to be interviewed by Hannah be afforded the opportunity to have legal counsel with respect to the investigation." *Id.* ¶ 42 (citing Beran Email,

Hurley Dep. at 75:25-76:5).  Beran also said that "[a]s a matter of professionalism and courtesy, the

company should provide counsel at no cost to the employees who choose to utilize such counsel."

*Id.* ¶ 43 (citing Beran Email).

To that end, Beran told the Board that he would circulate "a written consent approving an

authorized representative of FN to sign a Vinson & Elkins engagement letter with employees, solely

for the purposes of FN's agreement to pay the costs associated with the representation (and not for

purposes of Vinson & Elkins representing FN in any way)."  *Id.* ¶ 44 (citing Beran Email).  Beran

explained that

> [b]ased on the conversation with Vinson & Elkins, we expect that the bill for this
> engagement would be no greater than $20,000 (and very likely to be less).  This would
> be a joint representation of those FN employees who choose to utilize Vinson &
> Elkins.  There would be no obligation for such employees to utilize such counsel.

*Id.* ¶ 45 (citing Beran Email).  The request did not refer to the LLC Agreement.  *Id.* ¶ 46 (citing

Beran Email).  Nor did the request say that Fiduciary Network employees were entitled to

indemnification.  *Id.* ¶ 47 (citing Beran Email; Hurley Dep. at 75:20-24).  And the request did not

seek Board approval to pay Hurley's legal fees.  *Id.* ¶ 48 (citing Hurley Dep. at 74:6-24).

The Board approved Beran's request to retain Vinson & Elkins for employees who were not

otherwise represented by counsel.  *Id.* ¶ 50 (citing Board Emails, Ex. 18 to Steiner Dec.; Hurley Dep.

at 66:16-67:5).  Hurley voted for the Board's resolution approving the retention of Vinson & Elkins.

*Id.* ¶ 51 (citing Board Emails; Hurley Dep.at 67:3-7).  The Board resolution did not include the fees

incurred by Kanner, Ben Robins, or Steven Cortez, all of whom were represented by Ropes.  *Id.* ¶ 52

(citing Board Emails; Hurley Dep. at 67:22-24, 69:14-70:14).  Hurley retained Ropes and Brewer as

counsel for the internal investigation, as he had for the arbitration proceedings.  *Id.* ¶ 53.  But

Brewer had only a limited role before it filed a complaint on Hurley's behalf in Texas state court in

December 2018.  *Id.* at 12 (citing Affirmation of Farida Ali ("Ali Aff."), Ex. 2 to Declaration of

Michael Collins ("Collins Dec."), Dkt No. 79, ¶ 6). Berkowitz interviewed Hurley as part of the internal investigation. *Id.* ¶ 54 (citing Answer ¶ 25).

In October 2018, Hurley's counsel submitted a letter to Beran demanding indemnification of legal fees and expenses for almost $1.5 million. *Id.* ¶ 55 (citing Weiner Letter, Ex. 19 to Steiner Dec., Hurley Dep. at 14:17-17:19). Hurley sought indemnification for fees and expenses incurred by Ropes and Brewer. *Id.* ¶ 56 (citing Weiner Letter). The parties dispute whether Hurley was seeking to collect fees already reimbursed in the Final Award. *Id.* at 13-15. But Weiner told Beran that Hurley was "not seeking to collect the same fees twice." *Id.* ¶ 61 (citing Hurley Dep. at 44:15-16). The letter seeking indemnification does not refer to Section 6.7, the indemnification provision of the LLC Agreement. *Id.*

### 5. The Sale Process and Hurley's Post-Sale Communications

After the Tribunal issued the Final Award, Hurley participated in the Sale Process. *Id.* ¶ 36 (citing Answer ¶¶ 15, 18). The bidders submitted their final bids in October 2018. *Id.* ¶ 37 (citing Answer ¶ 30). One month later, the leading bidder submitted an irrevocable offer, which the Negotiating Committee determined was the high third-party bid. *Id.* ¶ 38 (citing Answer ¶ 20). Three days after the leading bidder submitted an irrevocable offer, EB exercised its ROFR to purchase the equity owned by Hurley and other members of Fiduciary Network management. *Id.* ¶ 39 (citing Texas Compl. ¶ 79, Final Award ¶ 5 & n.3). Hurley was terminated as CEO. *Id.* ¶ 67 (citing Hurley Dep. at 85:13-20, 86:16-22, 91:17-21; Defendant's Objections and Answer to Plaintiff's First Set of Interrogatories, Ex. 28 to Steiner Dec. at 9-10, No. 6).

After Hurley learned that EB had exercised its ROFR, Hurley contacted the CEOs of all Fiduciary Network's Portfolio Companies. *Id.* Hurley testified that he told the CEOs of the Portfolio Companies that

> everybody in the organization had been terminated, and what that implication meant that people they were working with in the organization on very important matters specific to their organization, those people were not going to be there any longer. And

therefore it was unclear, you know, what would happen in terms of how long it would take or a decision process or what would be needed to get those matters resolved.

*Id.* at 18 (citing Hurley Dep. at 92:12-21).  And in response to a question about why he called the

CEOs of Fiduciary Network's Portfolio Companies, Hurley testified that

> my goal was to make sure they knew what was going on because . . . there's a[n] enormous amount of on[]going . . . interaction between FN and the companies, including many things that were in progress.  And I don't want them in a position where they didn't know what was going on, that we weren't going to be there because literally the next day they'd call and there would nobody to answer.  And many will have to make decisions as to what to do regarding things that were pending, and so I felt an obligation to them to understand that, guys, we're not going to be there, I just want to give you a heads up.  But they were very short calls.  This was, like, very short. It was just to alert them that when they call, there's no answer, this is what was going on.

*Id.* (citing Hurley Dep. at 88:24-89:19).

As part of his round of calls to the CEOs of Fiduciary Network's Portfolio Companies, Hurley called Allan Zacharaih, the co-CEO of Portfolio Company Pathstone Federal Street ("Pathstone").  *Id.* ¶ 69 (citing Deposition of Karl Heckenberg ("Heckenberg Dec."), Ex. 31 to Steiner Dec. at 71:11-22, 72:11-24; Deposition of Barry Friedberg ("Friedberg Dep."), Ex. 32 to Steiner Dec., at 84:7-19).  The parties dispute what Hurley said on that call.  Fiduciary Network argues that Hurley "threatened to commence litigation against Pathstone."  *Id.*  Hurley denies that made any such threat.  *Id.* at 18-19.  Indeed, Hurley denies that he said anything about litigation against Fiduciary Network or Pathstone.  Hurley Dep. at 89:23-91:16.  Hurley argues that he called Zachariah to "inform him that EB had exercised [its] ROFR, and that the entirety of Fiduciary Network's management team had been terminated."  Pls' 56.1 Stmt at 18 (citing Answer ¶ 23).

Hurley has discussed with the CEOs how some of the Portfolio Companies can renegotiate their contacts with Fiduciary Network.  Hurley has spoken with the majority of the CEOs of the fourteen Portfolio Companies.  *Id.* ¶¶ 70-71 (citing Hurley Dep. at 112:8-19, 113:9-114:8, 119:7-9, 123:9-20).  Hurley insists, however, that some of the CEOs are "close friends" of his.  *Id.* at 20 (citing Hurley Dep. at 113:19-114-2).  Hurley also argues that he contacted the CEOs "for the

purpose of discussing publicly available information." *Id.* at 20 (citing Hurley Dep. at 113:19-114:2, 120:18-23). Hurley testified at his deposition that the CEOs he spoke with "asked questions about documents because, I think, based on some public information . . . there was an article where they were talking about trying to reduce the stringent terms that I had imposed upon them or something like that and renegotiate deals." *Id.* at 20 (citing Hurley Dep. at 113:19-114:2). Hurley also testified that he "tr[ied] to keep it limited to anything that's public and keep it narrow." *Id.* (citing Hurley Dep. at 120:18-23). But Hurley does not dispute that he spoke with CEOs of Portfolio Companies about renegotiating the terms of their contracts with Fiduciary Network.

### 6. The Texas Litigation

In December 2018, Hurley sued EB and the EB-appointed Board members of Fiduciary Network in Texas state court. *Id.* ¶ 72 (citing Ex. 2 to Steiner Dec.). Hurley alleged that EB interfered with the Sale Process to depress the price offered by third-party bidders for Fiduciary Network. *Id.* That allegedly enabled EB to purchase Hurley's interest for less than it was worth. *Id.* Hurley also claimed tortious interference with business relations, defamation, business disparagement, civil conspiracy, and derivative claims for tortious interference and breach of fiduciary duty. *Id.* at 21.

Hurley's complaint quoted from and attached copies of documents from the arbitration that were subject to a Confidentiality Order. *Id.* ¶ 73 (citing Texas Comp., Final Award ¶¶ 21, 198; Letter to Justice Barry Ostrager, Ex. 33 to Steiner Dec; Letter to Judge Alison Nathan, Ex. 34 to Steiner Dec.). Hurley purports to dispute this fact, but he admits that his attorney "inadvertently filed sealed material[.]" *Id.* at 21 (citing Ali Aff. ¶ 6). The documents were publicly filed without redaction. *Id.* ¶ 74 (citing Texas Complaint).

Two days later, Hurley sent unredacted copies of the complaint in the Texas litigation and its exhibits to the CEOs of twelve Portfolio Companies. *Id.* ¶ 75 (citing Hurley Email, Ex. 35 to Steiner Dec.; Hurley Dep. at 103:15-105:4, 192:5-193:10). Several exhibits to the complaint sent by

Hurley had been ordered sealed by the New York Supreme Court and the United States District Court for the Southern District of New York. *Id.* ¶ 77 (citing Letter to Justice Ostrager; Letter to Judge Nathan). Hurley testified that he sent the complaint to the CEOs because "they just needed to be fully informed to know what was going on." *Id.* ¶ 78 (citing Hurley Dep. at 106:2-3).

The media published articles about the Texas lawsuit after Hurley's counsel filed the complaint on his behalf. *Id.* ¶ 80 (citing Hurley Dep. at 103:18-19; New York Post Article, Ex. 37 to Steiner Dec.). The New York Post published one such article. *Id.* That article quotes from Exhibit 26 to Hurley's complaint in the Texas litigation, which is the Final Award that had been filed under seal. *Id.* ¶ 81 (citing New York Post Article; Texas Compl.; Letter to Judge Nathan). Hurley discussed media strategy with his counsel before his counsel filed the Texas litigation. *Id.* ¶ 85 (citing Hurley Dep. at 164:14-165:15).

### 7. Fiduciary Network's Post-Sale Business Opportunities

Fiduciary Network was negotiating with three companies to finance transactions in November 2018. Fiduciary Network argues that two of these transactions fell through and that the third was substantially delayed because of Hurley's sabotage. Hurley disagrees that he caused any deals not to close or to be substantially delayed.

The first such transaction was for Fiduciary Network to provide financing to LourdMurray. *Id.* ¶ 86 (citing Heckenberg Dep. at 54:17-55:11). Fiduciary Network submitted a letter of intent ("LOI") to the investment banker on the deal in November 2018. *Id.* ¶ 87 (citing Heckenberg Dep. at 55:9-56:19); *see also* LOI, Ex. 38 to Steiner Dec. A Fiduciary Network internal financial analysis of the proposed deal estimated its value at almost $40 million. Pls.' 56.1 Stmt ¶ 91 (citing LOI; LourdMurray Spreadsheet, Ex. 39 to Steiner Dec.). After Fiduciary Network submitted the LOI, LourdMurray's investment banker contacted Heckenberg and described Fiduciary Network's bid as "very compelling[.]" *Id.* ¶ 87. The investment banker later told Heckenberg that Fiduciary Network's bid was "very interesting[.]" *Id.* (citing Heckenberg Dep. at 54:17-56:19). But in mid-

December 2018, the investment banker told Heckenberg that "he and the principals of LourdMurray had seen the news of the lawsuit that was filed in Texas[] and didn't feel comfortable moving conversations forward with Fiduciary Network." *Id.* ¶ 89 (citing Heckenberg Dep. at 56:23-57:8) (brackets omitted). LourdMurray eventually contracted with HighTower Advisors for financing. *Id.* ¶ 90 (citing Heckenberg Dep. at 53:9-54:15).

In the second transaction, Fiduciary Network was to provide financing to Pathstone to acquire two wealth managers, EMM Wealth Management ("EMM Wealth") and William Harris Investors ("WHI"). *Id.* ¶ 92 (citing Heckenberg Dep. at 36:2-37:4, 71:22-72:24). Fiduciary Network prepared a financial analysis of both potential transactions. *Id.* ¶ 93 (citing WHI Spreadsheet, Ex. 40 to Steiner Dec.; EMM Spreadsheet, Ex. 41 to Steiner Dec.). Neither transaction closed, though the parties dispute whether that was because of anything Hurley did. Fiduciary Network argues that the transaction didn't close because of Pathstone's concern that it might be sued by Hurley. *Id.* ¶ 92 (citing Heckenberg Dep. at 36:2-37:4, 71:22-72:24).

For the final transaction, another of Fiduciary Network's Portfolio Companies, RegentAtlantic, was negotiating to acquire a company called Hillview. *Id.* ¶ 94 (citing Heckenberg Dep. at 45:20-47:9). The transaction ultimately closed in May 2019. *Id.* But Fiduciary Network argues that Hurley's actions caused the closing to be delayed from January 2019. *Id.* And because of that delay, Fiduciary Network argues that the Hillview deal had to be re-negotiated and that Fiduciary Network lost interest for the four-month period from January to May. *Id.* ¶ 95 (citing Heckenberg Dep. at 47:10-23).

### B. Procedural History

Fiduciary Network sued Hurley in New York state court. Dkt No. 3. The complaint asserts three claims. Complaint, Dkt No. 3-1. First, Fiduciary Network seeks a declaratory judgment that it does not owe Hurley almost $1.5 million in legal fees and expenses in connection with Fiduciary Network's internal investigation of his alleged domestic violence incident. *Id.* ¶¶ 29-34. Second,

Fiduciary Network asserts a claim for damages for tortious interference with prospective economic advantage and business relations because Hurley allegedly threatened to sue Pathstone and its co-CEOs. *Id.* ¶¶ 35-40.  Third, Fiduciary Network asserts a claim for declaratory and injunctive relief based on Hurley's alleged tortious interference. *Id.* ¶¶ 41-44.

The parties cross-move for summary judgment.  Hurley moves for partial summary judgment on both of Fiduciary Network's tortious interference claims.  Dkt Nos. 61-64.  Fiduciary Network moves for summary judgment on its first and third claim and for partial summary judgment as to liability on its tortious interference claim.  Dkt Nos. 65-69.  Fiduciary Network concedes, however, that there will need to be trial on damages.  Memorandum of Law in Support of Fiduciary Network's Motion for Summary Judgment ("FN Mem."), Dkt No. 69, at 2-3.  Both parties opposed the other side's motion.  Dkt Nos. 74-79.  Hurley also moved to strike certain pieces of evidence Fiduciary Network relies on to support its motion because, he argues, it is hearsay.  Dkt Nos. 72-73.  Both parties replied.  Dkt Nos. 82-86.  Hurley again moved to strike evidence that Fiduciary Network relied on in its opposition to his motion for summary judgment.  Dkt Nos. 80-81.  Fiduciary Network opposed Hurley's motions to strike.  Dkt No. 87.

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))).  The movant must "identify[] each claim or defense—or the part of each claim or defense—on which" it seeks summary judgment.  Fed. R. Civ. P. 56(a).  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party[,]" and a fact is material if

it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary" do not preclude summary judgment. *Id.*

The movant bears the initial burden of showing "the absence of a genuine issue of material fact." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323). If the movant carries that burden, the burden shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Id.* To defeat a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)) (emphasis omitted). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. And the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The non-movant "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quotation omitted).

"Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). So on summary judgment, a court cannot "weigh the evidence or resolve issues of fact[.]" *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citation omitted).

## III. DISCUSSION

### A. Hurley's Fee Demand

Fiduciary Network is entitled to summary judgment on its declaratory judgment claim that it need not pay Hurley's fee demand. Hurley argues that he is entitled to indemnification under Section 6.7, which governs indemnification. Section 6.7 provides:

> With respect to any claims, suits, actions or similar proceedings brought by any third party, the Company shall indemnify and hold harmless each current and each former Manager, each current and each former Member, each current and each former officer and employee of the Company, and each former management committee member of the Company (each, an "Indemnitee") from any and all liability, loss, cost, expense (including reasonable attorneys' fees and disbursements), claim or damage (collectively, "Management Expenses") incurred or sustained by such Indemnitee by reason of (i) any act or omission in the conduct of the business of the Company in accordance with the provisions hereof, or (ii) such Indemnitee's service as a representative, officer, director, manager, principal, employee or agent of the Company, except in each case to the extent that such Management Expenses were incurred or sustained as a direct result of such Indemnitee's willful misconduct, gross negligence, bad faith or fraud.

LLC Agreement § 6.7.

The LLC Agreement is governed by Delaware law.  LLC Agreement § 10.3.  "In interpreting a contract" under Delaware law, "the Court must give priority to the parties' intentions as reflected in the four corners of the agreement." *Bathla v. 913 Mkt., LLC*, 200 A.3d 754, 759 (Del. 2018) (quotation omitted).

> The Court must interpret clear and unambiguous terms according to their ordinary meaning, and in an unambiguous, integrated written contract, the Court may not use extrinsic evidence to vary or contradict the terms of that contract.  The test for ambiguity is whether the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings.  Thus, a contract is not rendered ambiguous simply because the parties do not agree upon its proper construction.

*Id.* at 759-60 (quotations and brackets omitted).  "[S]ummary judgment in contract disputes" is proper when "the language at issue is clear and unambiguous." *GMG Capital Invs., LLC. v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 783 (Del. 2012) (citations omitted).

Hurley has no right to indemnification under Section 6.7 because the internal investigation is not a "claim[], suit[], action[] or similar proceeding[.]"  LLC Agreement § 6.7.  Section 6.7 contemplates legal proceedings, such as a lawsuit.  *See, e.g.*, *Action*, Black's Law Dictionary (11th ed. 2019) (defining "action" as "[a] civil or criminal judicial proceeding").  The internal investigation is not such a legal proceeding.  Thus, Fiduciary Network's internal investigation does not fall within the unambiguous text of Section 6.7.

Hurley offers several counterarguments, but none are persuasive.  Hurley first argues that the internal investigation was an "action" under Section 6.7.  In support, Hurley points out that one of the definitions of "action" in Black's Law Dictionary is "the process of doing something; conduct or behavior."  Hurley's Opposition to Fiduciary Network's Motion for Summary Judgment ("Hurley Opp."), Dkt No. 76, at 7.  So, Hurley contends, Fiduciary Network was "taking action to determine whether Hurley was fit to remain as an employee or officer of Fiduciary Network."  *Id.*

This argument strips the word "action" of its context.  Under Delaware law, even "a single clause or paragraph"—much less a single word—"of a contract cannot be read in isolation, but must be read in context."  *Stonewall Ins. Co. v. E.I. du Pont de Nemours & Co.*, 996 A.2d 1254, 1260 (Del. 2010).  Although it is true that the word "action" can sometimes bear the broad meaning that Hurley seeks to ascribe to it, that interpretation conflicts with the context of Section 6.7.  *See Wayne Land & Mineral Grp., v. Del. River Basin Comm'n*, 894 F.3d 509, 532 (3d Cir. 2018) ("[R]ules of contract interpretation advise us to interpret the meaning of a word by considering the words associated with it." (citing *Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 520 (3d Cir. 2012) (observing that "[t]he ancient maxim 'noscitur a sociis' summarizes the rule that the meaning of words may be indicated or controlled by those words with which they are associated.  Words are known by the company they keep.")))  In context, "action" means a legal proceeding and does not include the internal investigation.

Hurley also argues that the internal investigation is a "proceeding."  The same reasoning for Hurley's argument about "action" also applies to his argument about "proceeding."  And this argument reads the word "similar" out of Section 6.7, which applies to "claims, suits, actions or *similar* proceedings."  LLC Agreement § 6.7 (emphasis added).  Under Delaware law, a court "must read the contract in its entirety and give effect to all of its terms and provisions[.]"  *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).  Because the word "similar" limits "proceedings," Section 6.7 applies only when the proceeding at issue is like a claim, suit, or action.  The internal

investigation is not like a claim, suit, or action.  So Hurley's argument based on dictionary definitions of the word "proceeding" is unavailing.  As this is a sufficient ground to grant summary judgment on Fiduciary Network's declaratory judgment claim, the Court need not take up its other arguments for why Section 6.7 does not apply.

Hurley has no right to indemnification for another reason:  The internal investigation was instigated by Fiduciary Network, not a third party.  Recall that Section 6.7 indemnifies employees "[w]ith respect to any claims, suits, actions or similar proceedings brought by any third party[.]" LLC Agreement § 6.7.  As Hurley testified, "Fiduciary Network is a party to the LLC [A]greement; it's not a third party."  Hurley Dep. at 29:20-31:4.  Because Fiduciary Network instigated the internal investigation, Hurley has no right to indemnification under Section 6.7.

The third-party requirement also bolsters the Court's conclusion that "claims, suits, actions or similar proceedings" in Section 6.7 refers to legal proceedings that do not include the internal investigation.  Third parties are likely to bring legal claims against indemnitees.  So Hurley's argument that the internal investigation is a claim, suit, action, or similar proceeding is an awkward fit with the third-party requirement.  And the Court's interpretations of the third-party requirement and the "claims, suits, actions or similar proceedings" language are mutually reinforcing.

Hurley admits that Fiduciary Network's Board oversaw the internal investigation but argues that the members of the Board "acted in their personal capacities and/or on behalf of Emigrant Bank and Howard Millstein throughout the investigation."  Hurley Opp. at 5.  Because the members of the Board were not acting in their official capacities, Hurley argues, they qualify as "third parties" under Section 6.7.

This argument gets points for creativity, but it's thoroughly unconvincing.  Hurley offers no evidence for his assertion that the Board members were acting in their personal capacities when they launched the internal investigation.  The Board acts on behalf of Fiduciary Network.  LLC Agreement § 6.1(a).  And the Board approved the internal investigation at a special Board meeting in

April 2018.  Final Award ¶¶ 77-78.  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *FTC v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019) (quotation omitted).  Indeed, "[c]onclusory allegations or denials" are "not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist."  *Id.* (quotation omitted).  Hurley's bald assertions are not enough to survive this motion for summary judgment.[5]

Hurley also argues that Fiduciary Network is not entitled to summary judgment because the Board resolved to pay employee legal expenses with respect to the internal investigation.  Hurley was still a Fiduciary Network employee at that time of the board's resolution, so Hurley argues that he is entitled to legal fees.  The Board agreed with General Counsel David Beran's suggestion to "provide . . . employees (other than Ben, Yvonne and Steve who I understand via Hanna have retained Ropes & Gray in regards to this matter)" with "joint counsel in connection with" employee interviews for the internal investigation.  Beran Email at 1.  Beran's email noted that "the employees" were "the only ones who are not represented by counsel in all of this[.]"  *Id.*  And the email noted Beran's expectation that he "expect[ed] that the bill for this engagement would be no greater than $20,000 (and very likely to be less)."  *Id.*

This "gotcha" argument is a non-starter.  Hurley admitted at his deposition that this Board resolution did not cover him.  *See* Hurley Dep. at 74:11-24 ("They're not talking about . . . paying for my counsel. . . . Q. Okay.  And you agree that approving this was not approval of . . . paying for counsel for you; correct? . . . A. That's correct.").  Even absent that admission, it is doubtful that the Board's resolution gave anyone a legally enforceable right to force Fiduciary Network to pay their

---

[5] Fiduciary Network raises a substantial issue about whether Hurley incurred his attorney's fees "by reason of (i) any act or omission in the conduct of the business of the Company in accordance with the provisions hereof, or (ii) [his] service as a representative, officer, director, manager, principal, employee or agent of the Company."  LLC Agreement § 6.7. Because the Court has determined that Hurley has no right to legal fees for other reasons, it need not decide whether this is an independent basis on which to grant Fiduciary Network's claim for declaratory judgment.

legal fees.  The Board did not sign a contract to provide its employees with legal representation but chose to do so "[a]s a matter of professionalism and courtesy[.]"  *Id.*  It is also clear that the Board did not intend to cover Hurley's almost $1.5 million in legal expenses.  Beran's email stated that he was seeking counsel on behalf of employees "who at the moment are the only ones represented by counsel in all of this[.]"  Hurley was represented by counsel at that time.  And, of course, the $1.5 million that Hurley demanded is orders of magnitude larger than the $20,000 or less Beran estimated that providing counsel would cost in his email.  Thus, Hurley has no right to legal fees based on the Board's resolution.

Because Section 6.7 is unambiguous and Hurley's argument about the Board's resolution lacks merit, Fiduciary Network is entitled to summary judgment on its claim for a declaratory judgment that it need not reimburse Hurley's legal fees associated with the internal investigation.

### B. Tortious Interference Claims

#### 1. Fiduciary Network's Motion for Summary Judgment

Fiduciary Network is not entitled to summary judgment on its tortious interference claims because there are disputed issues of fact about whether Hurley acted for a wrongful purpose or used dishonest, unfair, or improper means.

> To prevail on a claim for tortious interference with business relations—also known as tortious interference with prospective economic advantage—under New York law, a plaintiff must show that (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship.

*16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015) (quotation omitted).[6]  "[T]he requirements of this tort are more demanding than those imposed on a party asserting tortious interference with the performance of an existing contract."  *Henneberry v. Sumitomo Corp. of Am.*, 532

---

[6] This claim does not arise under the LLC Agreement and so is not governed by the LLC's Agreement choice-of-law provision.  The parties assume that New York law applies to the tortious interference claim "and such implied consent is sufficient to establish the applicable choice of law."  *Trikona Advisers Ltd. v. Chugh*, 846 F.3d 22, 31 (2d Cir. 2017) (quotation and ellipsis omitted).

F. Supp. 2d 523, 547 (S.D.N.Y. 2007) (citation omitted).  Also, "conduct constituting tortious interference with business relations is, by definition, conduct, directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship."  *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 192 (2004) (brackets omitted).  Fiduciary Network alleges that Hurley interfered with its business relations with LourdMurray, Pathstone, and RegentAtlantic.

In *16 Casa Duse*, the Second Circuit explained the requirements for the third element of a tortious interference claim:

> [T]he "wrongful means" element sets a high bar.  Unlike a claim for tortious interference with contract, which requires a plaintiff to show no more than that the defendant intentionally and without justification procured a breach of a valid contract of which he was aware, a claim for tortious interference with business relations requires a plaintiff to show, "as a general rule," that "the defendant's conduct amounted to a crime or an independent tort."  New York courts have recognized an exception to this rule "where a defendant engages in conduct for the sole purpose of inflicting intentional harm on plaintiffs."  But this exception is narrow:  When a defendant has acted with a permissible purpose, such as "normal economic self-interest," wrongful means have not been shown, even if the defendant was "indifferent to the plaintiff's fate."  The New York Court of Appeals has not yet identified any other exceptions to the general rule.

791 F.3d at 262 (citing *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996) and quoting *Carvel Corp.*, 3 N.Y.3d at 190-91) (alterations omitted).  In sum, the third element of a tortious interference with economic advantage claim is satisfied when either 1) the defendant used improper means because her conduct "amounted to a crime or independent tort" or 2) the defendant acted with a wrongful purpose because she acted "for the sole purpose of inflicting intentional harm on plaintiffs."  *Id.* (citations omitted).

There are issues of material fact about whether Hurley acted through improper means or with a wrongful purpose.  Fiduciary Network argues that it has satisfied this element in several different ways, but all its arguments raise factual disputes that preclude summary judgment.  That is unsurprising because "questions of subjective intent"—such as whether Hurley acted solely to harm Fiduciary Network—"can rarely be decided by summary judgment."  *United States v. City of N.Y.*, 717

F.3d 72, 82 (2d Cir. 2013) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982)).  Indeed, the summary judgment hurdle is especially high because it is not enough for Fiduciary Network to show that Hurley was motivated to harm Fiduciary Network among other reasons.  Fiduciary Network must instead show that Hurley acted "for the *sole* purpose" of harming Fiduciary Network.  *16 Casa Duse*, 791 F.3d at 262 (emphasis added) (citations omitted).  Fiduciary Network has not carried that heavy burden.

Fiduciary Network first argues that Hurley acted solely to harm Fiduciary Network when he contacted the CEOs of the Portfolio Companies and told them that Fiduciary Network's employees had been terminated.  But there is a dispute of fact as to Hurley's motivation for doing so.  Hurley testified that he felt obligated to update the CEOs about his termination because his termination might damage their businesses.  *See* Hurley Dep. at 92:12-21.  Given that testimony, the Court cannot conclude that Hurley's behavior was solely motivated by a desire to harm Fiduciary Network.

Fiduciary Network insists that Hurley had "no right" to talk to these CEOs about Fiduciary Network.  Fiduciary Network's Reply Memorandum of Law in Support of Its Motion for Summary Judgment, Dkt No. 83, at 8.  That assertion is odd; the question is whether Hurley tortiously interfered with Fiduciary Network's economic advantage, not what he had a "right" to do.  In any event, whether Hurley had a "right" to speak with the CEOs says nothing about *why* he did so.  Hurley's testimony creates an issue of fact on that question.  And Fiduciary does not argue that speaking with the CEOs amounted to an independent crime or tort.  So the Court cannot grant summary judgment on this basis.

Fiduciary Network also argues that Hurley acted improperly by filing his complaint in the Texas litigation.  But under New York law, "civil suits and threats thereof constitute 'improper means' only if such tactics are frivolous."  *10 Ellicott Square Court Corp. v. Violet Realty, Inc.*, 916 N.Y.S.2d 705, 707 (4th Dep't 2011) (quoting *Pagliaccio v. Holborn Corp.*, 734 N.Y.S.2d 148, 149 (1st Dep't 2001)); *see also 16 Casa Duse*, 791 F.3d at 262 ("New York courts have left open the possibility

that a defendant who has 'harass[ed]' a plaintiff with 'meritless litigation' may have utilized 'wrongful means.'" (quoting *Carvel Corp.*, 3 N.Y.3d at 192)); *id.* at 263 (granting summary judgment on tortious interference claim because lawsuit was not "frivolous, objectively unreasonable, or patently meritless"). As explained below, the Court holds that no reasonable jury could conclude that the Texas litigation "the sort of egregious wrongdoing that might support a tortious interference claim in the absence of an independently unlawful act or evil motive." *16 Casa Duse*, 791 F.3d at 263 (quoting *Carvel Corp.*, 3 N.Y.3d at 189) (brackets omitted). So the filing of the Texas lawsuit cannot serve as the basis for Fiduciary Network's tortious interference claim.

Fiduciary Network next argues that Hurley acted improperly because his attorney included confidential information in the exhibits to his complaint in the Texas litigation. The parties agree that some of the exhibits attached to Hurley's complaint in the Texas litigation were subject to a Confidentiality Order. *See, e.g.*, Ali Aff. ¶ 9. And it is true that disclosure of confidential information can sometimes be the basis for an independent tort claim. *See, e.g.*, *Computer Assocs Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 717 (2d Cir. 1992) ("Trade secret claims often are grounded upon a defendant's breach of duty of trust or confidence to the plaintiff through improper disclosure of confidential material." (citation omitted)).

But the Court cannot conclude that filing the complaint in the Texas litigation meets the wrongful purpose or improper means element. One of Hurley's attorneys who represents him in the Texas litigation affirmed that she filed confidential material in the Texas litigation "inadvertently." Ali Aff. ¶ 9. Fiduciary Network has not pointed to evidence in the record that Hurley knew that some exhibits to the Texas complaint included confidential information. Indeed, Hurley testified that he reviewed the exhibits to the complaint in the Texas litigation only after it was filed. Hurley Dep. at 154:14-16. And Fiduciary Network has not argued that Hurley committed a specific crime or tort when his attorney filed the complaint in the Texas litigation. Here, Hurley's

attorney's inadvertent inclusion of confidential information in exhibits to the Texas complaint cannot establish the wrongful purpose or improper means element for purposes of this motion.

Nor is Hurley's forwarding of the complaint in the Texas litigation to the CEOs of the Portfolio Companies adequate to establish the wrongful purpose or improper means element. Again, Fiduciary Network has pointed to no evidence in the record that Hurley knew that the exhibits contained confidential information when he forwarded them. Fiduciary Network suggests that Hurley sent the complaint to the CEOs of the Portfolio Companies solely to harm its ongoing business relationships with the Portfolio Companies. But Hurley testified that he sent the Texas complaint to the CEOs of the Portfolio Companies because he felt they "needed to be fully informed to know what was going on." *Id.* at 106:2-3. So Hurley may have been acting at least in part out of a desire to do right by his former clients. Given Hurley's testimony, there is a disputed issue of fact about why Hurley sent the Texas complaint to the CEOs of the Portfolio Companies.

Fiduciary Network finally argues that Hurley's decision to "provid[e] strategic advice concerning the potential for renegotiating their existing agreements with Fiduciary Network" establishes the wrongful purpose or improper means element. FN Mem. at 20. The Court disagrees. True, Hurley testified that he spoke with the CEOs of the Portfolio Companies in which he discussed "trying to reduce the stringent terms that [Hurley] had imposed upon them" as CEO of Fiduciary Network by "renegotiat[ing] [their] deals" with Fiduciary Network. Hurley Dep. at 113:24-114:2. But "[s]imple persuasion does not suffice" to meet the wrongful purpose or improper means element of a tortious interference with economic advantage claim. *Oxyn Telecomms., Inc. v. Onse Telecom*, No. 01-cv-1012 (JSM), 2003 WL 22271224, at *6 (S.D.N.Y. Sept. 30, 2003) (citing *Jabbour v. Albany Med. Ctr.*, 654 N.Y.S.2d 862, 864 (3rd Dep't 1997)). And Hurley testified that many of the CEOs are "very close friends" of his. Hurley Dep. at 93:20. Given that testimony, there is a disputed issue of fact about whether Hurley sought to help his friends or to harm Fiduciary

Network by giving them advice.  If Hurley sought only to help his friends, then he did not act solely with an improper purpose.

In sum, there are disputed issues of fact about whether Hurley "acted for a wrongful purpose or used dishonest, unfair, or improper means" to interfere with Fiduciary Network's busines relationships.  *16 Casa Duse*, 791 F.3d at 261 (quotation omitted).  Because this is enough to deny Fiduciary Network's motion for summary judgment, the Court need not evaluate the other three elements of its tortious interference claim.  And Fiduciary Network's claim for injunctive relief against Hurley is denied because Fiduciary Network has not shown "actual success on the merits" as required for a permanent injunction.  *All. for Open Soc'y Int'l, Inc. v. United States Agency for Int'l Dev.*, 911 F.3d 104, 109 n.2 (2d Cir. 2018), *rev'd sub nom. on other grounds*, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082 (2020) (citations omitted).

### 2. Hurley's Motion for Partial Summary Judgment

Hurley's motion for partial summary judgment is granted in part because no reasonable jury could conclude from the record that the Texas lawsuit was frivolous or brought in bad faith.  As noted above, "the 'wrongful means' element sets a high bar."  *16 Casa Duse*, 791 F.3d at 262.  A lawsuit can satisfy this element only "if it is 'frivolous, objectively unreasonable, patently meritless,' or brought in subjective bad faith."  *MZ Wallace Inc. v. Fuller*, No. 18-cv-2265 (DLC), 2018 WL 4007645, at *5 (S.D.N.Y. Aug. 22, 2018) (quoting *16 Casa Duse*, 791 F.3d at 263) (ellipsis omitted).  Litigation, "however misguided," cannot satisfy the wrongful means element unless it "amount[s] to 'the sort of egregious wrongdoing that might support a tortious interference claim in the absence of an independently unlawful act or evil motive."  *16 Casa Duse*, 791 F.3d at 263 (quoting *Carvel Corp.*, 3 N.Y.3d at 189).

No reasonable factfinder could conclude that the Texas lawsuit was frivolous.  Fiduciary Network argues that the lawsuit was frivolous because the claims at issue there were subject to an arbitration agreement.  It is true that Judge Boyle granted the motion to compel arbitration.  *See*

*Hurley v. Emigrant Bank*, No. 3:19-cv-11-B, 2019 WL 5537330, at *1 (N.D. Tex. Oct. 25, 2019).  As described in *Emigrant Bank*, Hurley and his LLC, JA Brookview (the "Texas Plaintiffs"), filed a complaint in Texas state court, claiming tortious interference with prospective business relations, defamation, business disparagement, breach of fiduciary duty, and civil conspiracy and naming "Emigrant Bank, [Howard] Milstein, . . . other EB Safe directors[,]" and EB Safe as defendants (the "Texas Defendants").  *Id.* at *2.  The complaint also brought derivative claims on behalf of Fiduciary Network.  The Texas Defendants removed the case to federal court and moved to compel arbitration based on the LLC Agreement.  *Id.*  The Texas Plaintiffs then amended the complaint to "remove[] all allegations and references related to EB Safe and instead attribute their previous allegations to Emigrant Bank and the other Defendants."  *Id.*  They "also removed any derivative claims on Fiduciary Network's behalf."  *Id.*

The Texas Defendants again moved to compel arbitration.  The Texas Plaintiffs "argue[d] that there is not a valid arbitration agreement between the parties because none of the Defendants are parties to the LLC Agreement, which contains the arbitration clause."  *Id.* at *3 (citations omitted).  The Texas Defendants countered that while "they did not sign the LLC Agreement[,]" the Texas Plaintiffs should be "equitably estopped from avoiding" arbitration.  *Id.*  Thus, "[t]he question [was] when a nonsignatory (or nonsignatories) to an arbitration agreement can compel signatories to arbitrate."  *Id.* at *4.  Applying Delaware law, Judge Boyle agreed that the Texas Plaintiffs were equitably estopped from avoiding arbitration under the LLC Agreement.  *Id.* at *4-8.  She then held that the dispute was subject to the arbitration clause and rejected the Texas Plaintiffs' argument that the Texas Defendants had waived their agreement to arbitrate.  *Id.* at *8-10.

Although Judge Boyle granted the motion to compel arbitration, there is inadequate evidence in the record for a reasonable factfinder to conclude that the Texas lawsuit was frivolous or was brought in bad faith.  The issue of whether the Texas Plaintiffs were bound to arbitrate by the doctrine of equitable estoppel was the subject of reasonable disagreement.  The argument that the

claims in the Texas litigation were not subject to arbitration was therefore not "frivolous, objectively unreasonable, or patently meritless." *16 Casa Duse*, 791 F.3d at 263.  Granted, Judge Boyle held that the Texas Plaintiffs' decision to amend the complaint "appear[ed] to be no more than a litigation tactic employed to avoid arbitration." *Emigrant* Bank, 2019 WL 5537330, at *7.  But that is not enough for a reasonable jury to conclude that the Texas lawsuit was frivolous.

Nor is there adequate evidence in the record to sustain the argument that the Texas lawsuit was brought in "subjective bad faith." *MZ Wallace*, 2018 WL 4007645, at *5 (citing *16 Casa Duse*, 791 F.3d at 263).  To satisfy this requirement, a plaintiff must "utterly lack[] belief in the merit" of the claim or must "intend[] only to harass" the defendant. *16 Casa Duse*, 791 F.3d at 263.  No reasonable factfinder could conclude from the record before the Court that, Hurley's decision to file the Texas lawsuit meets this standard.  At bottom, the Texas lawsuit, "however misguided," did not "amount to 'the sort of egregious wrongdoing that might support a tortious interference claim in the absence of an independently unlawful act or evil motive.'" *16 Casa Duse*, 791 F.3d at 263 (quoting *Carvel Corp.*, 3 N.Y.3d at 189).  No reasonable jury could conclude that the Texas lawsuit meets the "high bar" necessary to meet the wrongful means element of a tortious interference claim. *Id.* at 262.

The Court also grants partial summary judgment to Hurley to the extent that Fiduciary Network's tortious interference claim depends on the inclusion of confidential information in the exhibits to the Texas complaint.  To prove a claim for tortious interference, "the interference must be intentional, not negligent." *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 546 (S.D.N.Y. 2014); *see also Drake v. Lab. Corp. of Am. Holdings*, No. 02-cv-1924 (FB) (RML), 2007 WL 776818, at *4 (E.D.N.Y. Mar. 13, 2007), *aff'd*, 417 F. App'x 84 (2d Cir. 2011) (holding in the context of a tortious interference with contract claim that "the interference must be intentional, not merely negligent or incidental to some other, lawful purpose." (quoting *Alvord & Swift v. Stewart M. Muller Constr. Co.*, 46 N.Y.2d 276, 281 (1978)).

No reasonable jury could conclude from the record that Hurley intentionally included confidential information in the exhibits to the Texas complaint.  As noted above, Hurley's counsel filed the confidential material in the Texas litigation, and she did so "inadvertently."  Ali Aff. ¶ 9.  That affirmation supports the conclusion both that Hurley did not directly cause the confidential material to be filed publicly and that even if he did, he did so negligently and not intentionally.

Fiduciary Network points to evidence in the record that it claims is adequate to sustain its tortious interference claim, but that evidence is inadequate to create a genuine issue of material fact.  Fiduciary Network argues that Hurley testified that he reviewed drafts of the complaint before it was filed.  Hurley Dep. at 153:12-20.  That's true, but the confidential material was in the exhibits to the complaint.  Hurley testified that he didn't review those exhibits before his attorney filed the complaint.  *Id.* at 154:14-16.  Fiduciary Network also argues that the Texas complaint cites the "Second Arbitration Final Award," which was sealed.  Fiduciary Network's Reply in Support of Its Motion for Summary Judgment, Dkt No. 83, at 12 (citing Texas Complaint at 19 n.24).  That's also true, but the confidential material is cited in a footnote.  This evidence is inadequate to contradict Hurley's attorney's sworn statement that the material was filed "inadvertently."  Ali Aff. ¶ 9.  And if the confidential material was filed because of negligence, its filing cannot serve as the basis for the "wrongful means" element of a tortious interference claim.[7]  So Hurley is entitled to partial summary judgment to the extent that Fiduciary Network's tortious interference claim depends on the filing of confidential information in the exhibits to the Texas litigation.[8]

---

[7] In its opening memorandum in support of its motion for summary judgment, Fiduciary Network also notes that Hurley discussed media strategy with his counsel at Brewer and with public relations consultants before Hurley filed the Texas lawsuit.  *See* Hurley Dep. at 164:14-165:15.  After Hurley filed the Texas litigation, an article referring to the Texas litigation appeared in the New York Post.  *See* New York Post Article.  Fiduciary Network does not explicitly argue that this supports its argument that Hurley intentionally filed confidential information in the Texas litigation.  But even if it had, that Hurley discussed a media strategy before the Texas litigation was filed does not alter the Court's conclusion that Fiduciary Network has presented insufficient evidence to show that Hurley intentionally filed confidential information in the Texas lawsuit.

[8] Because the Court holds that neither the filing of the Texas lawsuit nor the inclusion of confidential information in its exhibits can serve as the basis for Fiduciary Network's tortious interference claim, it need not reach Hurley's arguments about the *Noerr-Pennington* doctrine or litigation privilege.

Hurley is not entitled to summary judgment on all Fiduciary Network's tortious interference claims because those claims are not based exclusively on the filing of the Texas lawsuit or the complaint's inclusion of confidential information, however.  As described above, Fiduciary Network has asserted other bases for its tortious interference claims.  And as the above analysis shows, Fiduciary Network has raised a dispute of fact about whether Hurley acted with a wrongful purpose or used improper means after he was terminated from Fiduciary Network.  To be clear, there is a dispute of fact about why Fiduciary Network forwarded the complaint in the Texas litigation to the CEOs of the Portfolio Companies.  Fiduciary Network is free to argue at trial that he did so solely to harm Fiduciary Network.  But Hurley is entitled to summary judgment to the extent that Fiduciary Network's tortious interference claims rest on the filing of the Texas lawsuit or the complaint's inclusion of confidential information.

Hurley argues that Fiduciary Network has presented no admissible evidence from which a factfinder could infer that Hurley acted solely to harm Fiduciary Network.  But that is not true.  The circumstances of Hurley's termination and his subsequent conversations with the CEOs of Portfolio Companies alone permit a reasonable factfinder draw that inference.  Thus, the Court cannot grant summary judgment to either party on Fiduciary Network's tortious interference claim.

Hurley also argues that Fiduciary Network lacks standing to assert a tortious interference with economic advantage claim against him.  That argument is unconvincing.  To begin with, it is not clear whether Hurley is arguing that Fiduciary Network lacks constitutional or prudential standing, or perhaps that Fiduciary Network has failed to state a claim because it has failed to prove damages.  In any event, Hurley's argument boils down to the assertion that Fiduciary Network's claim for tortious interference is derivative of claims to Pathstone and RegentAtlantic.  Recall that Fiduciary Network argues that it was damaged because Pathstone lost deals with EMM Wealth and WHI.  Fiduciary Network likewise argues that it sustained damage because RegentAtlantic's deal to acquire Hillview was delayed.

Fiduciary Network has standing to assert these claims.  Fiduciary Network provides financing to its Portfolio Companies.  So if one of Fiduciary Network's Portfolio Companies, like Pathstone, fails to make an acquisition that would have relied on financing from Fiduciary Network, it follows that Fiduciary Network is damaged because it loses the opportunity to provide that financing.  This damage is not "derivative" of damage suffered by the Portfolio Company; it is an independent harm suffered by Fiduciary Network.  It is true that there is a question of fact about the extent of Fiduciary Network's damages, which must be addressed at trial.  But Fiduciary Network has standing to assert these claims.  *See Brown v. AXA RE*, No. 02-cv-10138 (LTS), 2004 WL 941959, at *8 (S.D.N.Y. May 3, 2004).

The Court also need not take a position on Hurley's motions to strike some of Fiduciary Network's evidence because it is hearsay.  It is true that on summary judgment, a court must "consider all relevant, *admissible* evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (emphasis added and quotation omitted); *see also Bellamy v. City of N.Y.*, 914 F.3d 727, 750 (2d Cir. 2019) (noting that courts "may only consider admissible evidence" on summary judgment).  But here, the indisputably admissible evidence shows genuine issues of fact that preclude summary judgment for either party on Fiduciary Network's remaining theories for its tortious interference claim.  That conclusion remains the same whether the Court considers or ignores the evidence challenged in Hurley's motions to strike.  Because the Court need not rely on the challenged evidence, it need not decide whether the evidence challenged in the motion to strike is admissible.  Hurley's motions to strike is therefore moot and is denied.

## IV. CONCLUSION

Fiduciary Network's motion for summary judgment is GRANTED in part and DENIED in part.  Fiduciary Network is entitled to summary judgment on its claim for a declaratory judgment that it need not pay Hurley's attorneys' fee demand.  But there are disputed issues of fact that

preclude summary judgment on its tortious interference claims.  Hurley's motion for partial

summary judgment is also GRANTED in part and DENIED in part.  Neither the filing of the

Texas lawsuit nor the Texas complaint's inclusion of confidential information can sustain Fiduciary

Network's tortious interference claims.  But Hurley has not challenged the other bases for those

claims.  Hurley's motions to strike are DENIED as moot.

The Clerk of Court is directed to terminate the motions pending at Dkt Nos. 61, 65, 72, and

80.

SO ORDERED.

Dated:  July 31, 2020

_____
GREGORY H. WOODS
United States District Judge